AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**FILED**

SEP 1 9 2007

*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*
*SAN JOSE*

**NORTHERN**  _____ DISTRICT OF _____ **CALIFORNIA**

UNITED STATES OF AMERICA

**v.**

LANCE TOMLINSON,
BRANDON TOMLINSON, and
JEFFREY COFFRON

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

CASE NUMBER:

**CR 07   70556**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____ 4/1/06-9/1/07 _____ in _____ Santa Clara _____ county, in the

_____ Northern _____ District of _____ California _____ defendant(s) did, (Track Statutory Language of Offense)

knowingly conspire to possess with intent to distribute, and distribute, human growth hormone

in violation of Title ____ 18 ____ United States Code, Section(s) ____ 371 ____ .

I further state that I am a(n) _____ Special Agent, DEA _____ and that this complaint is based on the following
                    *Official Title*

facts:

Please see attached affidavit.
Maximum Penalties:
Five years imprisonment
$250,000 fine
Three years supervised release
$100 special assessment fee

No Bail Arrest Warrants Requested

Continued on the attached sheet and made a part hereof:      ☒ Yes      ☐ No

Approved
As To
Form:      _____
          AUSA: Jeff Nedrow

_____
Name/Signature of Complainant:

Sworn to before me and subscribed in my presence,

_Sept. 19, 2007_ _____      at _____ San Jose, California _____
Date                                        City and State

PATRICIA V. TRUMBULL, U.S. MAGISTRATE JUDGE          _____
Name & Title of Judicial Officer                      Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Patrick Donlin, being duly sworn, hereby depose and state the following:

### INTRODUCTION AND PURPOSE OF AFFIDAVIT

1. This affidavit is submitted in support of a request for the issuance of a complaint for Lance Tomlinson, Brandon Tomlinson, and Jeffery Coffron, persons involved in a conspiracy to illegally possess with intent to distribute, and distribute, Human Growth Hormone (hereafter, "HGH"), in violation of 18 U.S.C. § 371. As described below, the conduct of these individuals in knowingly distributing HGH provides a probable cause basis to believe that all three individuals have been knowingly involved in conspiring to illegally possess with intent to distribute, and to distribute, HGH, in violation of 18 U.S.C. § 371.

### AFFIANT'S BACKGROUND

2. I have been employed by the Drug Enforcement Administration (DEA) as a Special Agent since March 4, 2005 and am currently assigned to the San Francisco Field Division, San Jose Resident Office. Prior to becoming a DEA Special Agent, I was a licensed attorney in Ohio. I was an Assistant Cuyahoga County Prosecutor in Cleveland, Ohio from approximately 2000 to 2003. In my capacity as a DEA Special Agent, I investigate federal narcotics and money laundering offenses, including but not limited to, those enumerated in Title 21, United States Code, §§ 841, 843(b), and 846. I have received training and course instruction from the DEA relating to investigative techniques and the conduct of narcotics and financial investigations. Prior to working as a DEA Special Agent, I attended and graduated from the DEA Basic Agent Training Program in Quantico, Virginia. At the DEA Basic Agent Training Program, I received several hundred hours of comprehensive, formalized instruction in the recognition, distribution, manufacturing and packaging of controlled substances, as well as money laundering techniques and asset forfeiture.

1

My experience as an Assistant Cuyahoga County Prosecutor included the drafting and preparation of search warrants and prosecution of felony violations of the Ohio Revised Code, including felony narcotic violations.

3. I have spoken to, and worked with, more experienced federal, state and municipal agents and officers in connection with my work as a DEA Special Agent. In the course of my investigative experience as a DEA Special Agent, I have developed experience in the use of confidential informants, wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. The investigations in which I have participated have included such issues as the unlawful importation, possession with intent to distribute, and distribution of controlled substances.

4. I am familiar with the facts as set forth herein from my personal observations, observations by other law enforcement officers as related to me in conversation and in written reports, and from documents and other evidence obtained as a result of this and related investigations.

## LAW PERTAINING TO ANABOLIC STEROIDS AND HUMAN GROWTH HORMONE

5. Anabolic steroids are Schedule III Controlled Substances. 21 U.S.C. § 812(b), Schedule III (e) ; 21 C.F.R. § 1308.13(f). With certain exceptions authorized by law, it is unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S.C. § 841(a)(1).

6. Under the Food, Drug, and Cosmetic Act (FDCA), drugs are defined as, among other things, articles intended for use in the cure, mitigation, treatment or prevention of disease in man (21 U.S.C. §321(g)(1)(B)); articles intended to affect the structure or function of the body of man (21 U.S.C. §321(g)(1)©); or articles intended for use as components of other drugs (21 U.S.C.

2

§ 321(g)(1)(D)). A drug which because of its toxicity or other potentiality for harmful effect is limited to use under the professional supervision of a practitioner licensed by law to administer such a drug. See 21 U.S.C. §§ 353(a)(1)(A), (B).

7. The term "human growth hormone" (hereafter, "HGH") means somatrem, somatropin, or an analogue of either somatrem or somatropin. 21 U.S.C. § 333(e)(4). Somatrem is an analog of somatropin. Somatropin is defined as a synthetic or naturally-occurring growth hormone from the human pituitary gland. All human growth hormones are prescription drugs because of their toxicity and their potential for harmful effects. They are also prescription drugs because the method of their uses, or the collateral measures necessary to their uses, are not safe for use except under the supervision of a practitioner licensed by law to administer such a drug.

8. FDA approval is required for any HGH lawfully sold or distributed in the United States as a drug. The only HGH with FDA approval pursuant to 21 U.S.C. § 355 is limited to specific-approved uses, and such uses must be under the professional supervision of a practitioner licensed by law to administer such a drug. The knowing distribution of, or possession with intent to distribute, HGH for any use in humans is prohibited by Title 21, United States Code, Section 333(e) unless the use is for the treatment of a disease or other recognized medical condition where such use had been authorized by the Secretary of Health and Human Services and pursuant to a valid prescription. 21 U.S.C. § 333(e).

9. The only FDA-approved uses of HGH drugs authorized by the Secretary of Health and Human Services are limited to the following:

     a. Treatment of AIDS wasting or cachexia;

     b. Pediatric growth hormone deficiency;

     c. Short bowel syndrome in adults;

d. Adults with somatropin syndrome who meet one of two criteria (adult onset endogenous growth inadequacy due to pituitary or hypothalamic disease, surgery or trauma, or adults who had child-onset somatropin deficiency that was not treated);

e. Pediatric idiopathic short stature;

f. Pediatric patients with Turner syndrome;

g. Pediatric patients who are small for gestational age;

h. Pediatric growth failure due to renal insufficiency following transplantation; and

i. Children with Prader-Willi Syndrome.

10. Individuals, including athletes, often turn to performance-enhancing drugs, such as HGH, to increase muscle size and strength. As indicated in paragraph 9 above, medical practitioners are not permitted to prescribe HGH for the purpose of promoting muscle growth to improve athletic performance. As a result, these individuals seek to obtain the drug illegally, either by purchasing the drug from an unauthorized dispenser within the United States or by smuggling the drug into the United States.

## STATEMENT OF PROBABLE CAUSE

### CASE BACKGROUND

## STATEMENT OF PROBABLE CAUSE

### CASE BACKGROUND

11. Since 2005, I have been involved in investigating underground steroid labs and the illegal distribution of anabolic steroids in Northern California. In 2006, these investigative efforts identified a particular underground steroid lab operator involved in the illegal distribution of anabolic steroids. The lab operator has pled guilty to felony steroid distribution charges under 21

4

USC § 841. The lab operator has agreed to cooperate as a Confidential Source with the government and provide information and assistance regarding the government's investigation into illegal steroid distribution. (Accordingly, the lab operator is hereafter referred to as "CS1" for purposes of this affidavit). CS1 is providing information in this investigation in exchange for possible consideration of a more lenient sentence in his case at time of sentencing.

12. As a part of his cooperation, CS1 provided information regarding a Max Muscle Store located in San Jose, California that was illegally distributing quantities of HGH and anabolic steroids. CS1 stated that he understood that the HGH distributed by the Max Muscle store was typically stolen from Genentech, a Bay Area biotech company involved in manufacturing HGH and other drugs. From this investigation, I am aware that Max Muscle Stores are franchised, individually-owned stores which sell nutritional supplements, protein powders, and other fitness-related nutritional items. The stores are not licensed to distribute HGH, which can only be legally distributed by licensed medical personnel for approved medical reasons. I am familiar with two of these stores in San Jose and a third in Mountain View.

## THE MERIDIAN AVENUE MAX MUSCLE STORE

13. Pursuant to the investigation, I determined that the Max Muscle Store located on Meridian Avenue in San Jose was owned by one Lance Tomlinson. CS1 indicated familiarity with the name "Lance" as the person he understood to be involved in distributing HGH from the Max Muscle Store. Agents have further confirmed that Lance Tomlinson has a relationship with a person named Brandon Tomlinson who is employed at Genentech, and appears to be a relative of Lance Tomlinson.

14. On May 14, 2007, I met with an individual familiar with the illegal HGH distribution activities of both Lance Tomlinson and Brandon Tomlinson. This individual is

5

hereafter referred to in this affidavit as CS2.  CS2 has two state felony child abuse convictions.

CS2 originally requested the assistance of law enforcement in expunging his felony convictions.

The DEA has made no commitment to assist CS2 in this regard.  However, the DEA has indicated

that it will possibly compensate CS2 for the information he provides as a paid informant.  The

statements provided by CS2 are contained in the following paragraphs.

15.  According to CS2, CS2 met Lance Tomlinson in approximately 2006 in San

Jose, California.  CS2 stated that Lance Tomlinson owned two Max Muscle retail stores.  CS2

stated that CS2 first became of aware of Lance Tomlinson's involvement in drug trafficking when

discussing a photograph of Lance Tomlinson located in one of his stores.  According to CS2, Lance

Tomlinson was a body-builder, and the photograph naturally led to a discussion of illegal

performance-enhancing drugs.

16.  According to CS2, on more than one occasion in 2006 and 2007, Lance

Tomlinson told CS2 that he (Lance Tomlinson) could provide CS2 with "anything" CS2 wanted

(referring to steroids, Human Growth Hormone, and the prescription pain-killer Vicodin).  On one

occasion, CS2 witnessed Lance Tomlinson retrieve a Ziploc bag containing pills from a fanny pack

while at the Max Muscle Store.  CS2 further stated that Lance Tomlinson described these pills as

high dosage Vicodins.  Vicodin is a painkiller which can only be legally obtain through a lawful

prescription by medical personnel.  In CS2's presence, Lance Tomlinson subsequently sold some of

the pills to a customer who CS2 described as an "ultimate fighter."  I am aware that ultimate

fighting is a boxing-like sport in which individuals use a variety of martial arts to fight each other

in professional competitions.

17.  On another meeting between CS2 and Lance Tomlinson, Tomlinson specifically

inquired if CS2 was interested in obtaining HGH.  Lance Tomlinson quoted CS2 a price of $200 a

6

bottle. Lance Tomlinson stated that the HGH was of excellent quality and presented CS2 with a business card from Genentech. According to CS2, the last name on the business card was Tomlinson and described the card as white with blue lettering.

18. At the time of the above-summarized discussion with Lance Tomlinson in the preceding paragraph, CS2 was pending sentencing on his second felony child abuse conviction. In an effort to mitigate his possible sentence for that conviction, and to also gain a possible expungement of his earlier felony child abuse conviction, CS2 contacted Genentech in an attempt to speak with their corporate security, in the belief that such a communication would demonstrate his effort to cooperate with law enforcement and thereby benefit him at sentencing. (It should be noted that CS2 initiated this contact without the involvement of any federal law enforcement agency).

19. CS2 left a message for a corporate security official at Genentech. The corporate security official returned CS2's phone call and during this conversation CS2 explained that CS2 had learned that someone was stealing HGH from Genentech. The corporate security official inquired about the retail price of the HGH. CS2 responded that the price for one bottle of HGH was $200.00.

20. CS2 also explained that CS2 was motivated to assist Genentech not for financial gain, but to gain a benefit with respect to his criminal problems. The corporate security official stated that he would assist CS2 in contacting federal authorities who could assist CS2 with such a request.

21. The corporate security official also asked CS2 if CS2 could obtain the HGH, noting that he would have to get clearance from superiors. CS2 expressed concern as to whether purchasing the HGH would be legal. The corporate security official told CS2 that purchasing the

7

HGH was not illegal. The corporate security official then instructed CS2 to purchase the HGH using CS2's own money. CS2 did not provide the corporate security official or Genentech with the name of Lance Tomlinson or any other individual involved in HGH distribution.

22. Following the contact with the Genentech corporate security official, CS2 inquired with Lance Tomlinson about purchasing HGH. Lance Tomlinson responded that the HGH was only sold in ten-bottle quantities. When CS2 contacted the Genentech official regarding this development, the Genentech corporate security official state that he had not received clearance to spend that amount of money in investigating the matter. The corporate security official did, however, instruct CS2 to purchase the HGH using his/her own money.

23. According to CS2, CS2 subsequently went to Lance Tomlinson's Max Muscle store. During this sale, Lance Tomlinson waited for the store to clear of patrons and then retrieved ten bottles with green caps from the back of a refrigerator located in the store. Lance Tomlinson stated that this variety of HGH was called Nutropin. CS2 paid Lance Tomlinson $2,000.00 in cash for the ten bottles of HGH.

24. Following this purchase, CS2 contacted the Genentech corporate security officer and informed him that he had purchased the HGH. The corporate security officer indicated that he had received approval for the $2,000.00 and could meet CS2 to pick up the HGH and reimburse CS2.

25. CS2 and the Genentech corporate security officer agreed to meet at a Starbucks located at the Westfield Mall in San Jose. The corporate security officer stated that he would be accompanied by two other individuals and further described himself as wearing khaki pants and a blue shirt. The corporate security officer also reminded CS2 to keep the HGH cool.

26. CS2 subsequently described the meeting with the Genentech corporate security

8

officer. CS2 stated that the corporate security officer appeared to be alone. CS-2 and the corporate

security officer then spoke again about the corporate security officer's motivation, to which the

corporate security officer replied that the Federal Bureau of Investigation would be able to assist

with the CS' request. The corporate security officer also stated that his employer, Genentech, had

deep pockets, implying that Genentech could compensate CS2 momentarily. CS2 again reiterated

that his motivation for bringing this matter to the attention of Genentech was not monetary gain,

but assistance with his criminal record. The corporate security officer responded that he would call

the FBI, but suggested that they would not treat CS2 as well as the corporate security officer

would. CS2 had the impression that the FBI had already been contacted by the corporate security

officer.

27. The corporate security officer told CS2 that he wanted to have the HGH tested

to see if it was in fact HGH and to verify that it had come from Genentech. CS2 presented the

HGH to the corporate security officer; the corporate security officer responded that the bottles did

in fact look like the type of bottles used at Genentech.

28. According to CS-2, the corporate security officer seemed concerned about

whether or not the HGH was fake or "bad." Towards the end of the meeting between CS2 and the

corporate security officer, the corporate security officer retrieved a large amount of US currency

from his pocket. CS2 again asked if this was legal (referring to his purchase of the HGH), and the

corporate security officer responded that it was legal. The corporate security officer then paid CS2

$2,000 for the ten bottles of HGH. The corporate security officer gave CS2 an additional $500.00

as an "extra thank you." CS2 claimed that CS2 initially resisted the additional $500.00 but then did

accept the additional money.

29. While leaving the Starbucks, CS2 informed had heard of a Genentech product

9

called Raptiva, a psoriasis medication. CS2 told the corporate security officer that CS2 could

obtain Raptiva. The corporate security officer responded that if CS-2 could obtain some Raptiva, it

would be "huge." Before parting ways, the corporate security officer spoke to his superior and told

CS2 that his boss was upset that CS2 could obtain HGH.

30. CS2 called Lance Tomlinson and asked Lance Tomlinson if he could obtain

Raptiva. Lance Tomlinson was familiar with the drug and told CS2 that he (Lance Tomlinson) had

been told by his connection at Genentech (later identified as Brandon Tomlinson) to purchase

Genentech stock because Raptiva would raise the value of Genentech's stock. Lance Tomlinson

stated that his Genentech connection, referring to Brandon Tomlinson, did purchase additional

stock in anticipation of the introduction of Raptiva. At one point, CS2 called Genentech and asked

for Brandon Tomlinson. When connected to Brandon Tomlinson, CS2 hung up. CS2 did this to

confirm that Brandon Tomlinson existed and did, in fact, work for Genentech.

31. Lance Tomlinson stated that the Raptiva could only be taken from Genentech at

certain times; CS2 believed it would occur on a Friday.

32. CS2 contacted the corporate security officer at Genentech regarding this

information; the corporate security officer placed CS2 on the phone's speaker and stated he was

with his boss and other members of Genentech. According to CS2, the corporate security officer

began to inquire about CS2's source for the HGH; however CS2 refused to reveal any of the

individuals involved. The corporate security officer then stated that Genentech needed to know the

name of the individual who stole the HGH because that person could be the one who would test it

to determine its origin. CS2 handled this situation by providing the individuals at Genentech with

misinformation regarding the identity of the party taking the HGH from Genentech.

33. CS2 also stated that CS2 feared that if the name of the individual taking the

10

HGH was revealed, Genentech would have no incentive for helping CS2. During this call, the corporate security officer stated that the testing for the HGH would take some time and that the bottles of HGH provided by CS2 did not match the bottles used by Genentech. The corporate security officer also told CS2 to hold off on the Raptiva.

34. In a separate conversation with CS2, the corporate security officer stated that the HGH had been tested by an outside company and that the bottles did contain HGH; however the laboratory was not able to confirm the origin of the HGH. The corporate security officer also told CS2 that the bottles that contained the HGH were not the same variety used by Genentech. The corporate security officer also told CS2 that his superiors wanted more evidence that Genentech products were being stolen. The corporate security officer further stated that his superiors would only pay for items that were labeled.

35. Lance Tomlinson obtained the Raptiva requested by CS2 and contacted CS2, telling CS2 that he (Lance Tomlinson) had obtained a two month supply of Raptiva for $2,000.00. CS2 had originally thought the price for the Raptiva would only be $200.00.

36. CS2 contacted the Genentech corporate security officer and explained the Raptiva situation. The corporate security officer explained to CS2 that he would have to obtain permission to spend that much money. CS2 expressed frustration at this because CS2 had been instructed to purchase the Raptiva and now could not. According to CS2, the corporate security officer then instructed CS2 to obtain the Raptiva, and the corporate security officer would reimburse CS2 after gaining approval for the funds from Genentech. The corporate security officer also inquired if the bottles were labeled. CS2 stated that CS2 had not seen the Raptiva and therefore could not say if they were labeled or not.

37. CS2 and Lance Tomlinson spoke again regarding the Raptiva. CS2 stated that

CS2 would be going on a trip and would pick up the Raptiva after the trip.

38.  Upon returning from the trip, in approximately February/March 2007, CS2 went to Lance Tomlinson's residence at 52 Eaglehaven Court, San Jose, California, to pick up the Raptiva.  According to CS2, Lance Tomlinson retrieved a plastic bag containing several dozen vials from his refrigerator.  CS2 was surprised at the amount of Raptiva Lance Tomlinson was providing.  Lance Tomlinson explained that this Raptiva was considered to be the "gold standard" and is the type that his Genentech connection, referring to Brandon Tomlinson, uses to test.  CS2 also stated that Lance Tomlinson was unsure about the contents of the bottles and instructed CS2 to speak to Brandon Tomlinson about the taking the Raptiva.  Lance Tomlinson also provided CS2 with a set of written instructions for the Raptiva written by Brandon Tomlinson.  Lance Tomlinson stated that there were side effects associated with taking Raptiva.  The total price for the Raptiva was $2,400.00.

39.  CS2 stated that CS2 also noticed that there were several vials, some with blue caps.  CS2 noticed one vial in particular with a partial label with the word "Protropin."  CS2 inquired about purchasing the bottle labeled Protropin; Lance Tomlinson was initially hesitant to give the labeled bottle to CS2, but then relented, instructing CS2 scratch the label off.  CS2 also noticed that the bag that the Raptiva came in also had labeling and requested that Lance Tomlinson place all the bottles in the bag with the labeling.  Again Lance Tomlinson was hesitant, but again relented, instructing CS2 to burn the bags.

40.  CS2 also noticed that there were additional bags containing similar vials in Lance Tomlinson's refrigerator.  CS2 believed these bags to contain HGH as well.  Lance Tomlinson explained the difference between Nutropin and Protropin, both varieties of HGH.  Lance Tomlinson stated that Nutropin was an improved brand of HGH produced by Genentech, but he

12

(Lance Tomlinson) preferred their discontinued brand of HGH, Protropin. Lance Tomlinson also inquired if CS2 was interested in purchasing Vicodin. CS2 stated that CS2 was not interested in purchasing Vicodin.

41. The bottle of Protropin cost an additional $200.00, bringing CS2's total cost outlay to Lance Tomlinson for this drug purchase to $2,600.00. CS2 told Lance Tomlinson that CS2 did not have enough money to pay Lance Tomlinson that day. Lance Tomlinson stated that is was no problem to provide payment on a later date.

42. CS2 met Lance Tomlinson at a later date at his Max Muscle store at 1525 Meridian Road in San Jose, CA. CS2 stated that CS2 went to the store to pay Lance Tomlinson the $2,600.00 for the Raptiva and the Protropin. CS-2 further explained that CS2 paid $1,300.00 in cash and asked Lance Tomlinson if CS2 could place the remaining $1,300.00 on a credit card. Lance Tomlinson agreed and swiped CS2's credit card through the store's credit card machine. Lance Tomlinson handed CS2 a recipient for $1,300.00.

43. As a part of this investigation, I have established contact with a third confidential source, hereafter identified as CS3. CS3 is a family member of CS2 and has cooperated with this investigation in the hopes that doing so will assist CS2 with respect to his cooperation with the government. On April 20, 2007, CS3 gave me bottles of Raptiva and HGH which I understood to be the drugs provided by Lance Tomlinson to CS2 as described in the preceding paragraphs. The drugs were booked into evidence and referred to the Food and Drug Administration (FDA) for analysis.

44. CS2 also stated that Lance Tomlinson's employees at the Max Muscle store often sell the HGH for Lance Tomlinson. Lance Tomlinson also bragged about having connections to the Mexican Mafia.

13

45. CS2 further stated that CS2 had recorded a phone conversation with Brandon Tomlinson. This phone conversation was provided to Agents by CS2 and contained oral instructions from Brandon Tomlinson for taking Raptiva.

46. On August 28, 2007, I met with a fourth confidential source of information, hereafter identified as CS4. CS4's name had come to the attention of law enforcement in connection with his possible involvement in obtaining illegal performance-enhancing drugs as a user; however, to my knowledge, he has not been criminally charged or convicted in connection with his acquisition of such drugs. CS4 provided me with information regarding the Max Muscle store at 1525 Meridian Ave, San Jose, CA. CS4 stated that CS4 goes to the Max Muscle store only occasionally, probably once every three months. CS4 stated that while going to the Max Muscle store, CS4 has gotten to know two of the workers there, Lance and John. CS4 did not know their last names. Based on the investigation, "Lance" appears to be the previously described Lance Tomlinson, the owner of the Max Muscle store.

47. CS4 stated that in approximately early 2005, CS4 asked Lance Tomlinson about starting a cycle of steroids. Lance Tomlinson suggested to CS4 to start on what Lance Tomlinson called a "Star Cycle." CS4 stated that the "Star Cycle" consisted of "Deca" and "Sust". (I know from my experience in investigating steroid-related matters that these are likely shorthand terms for decadurabolin and sustenon, both anabolic steroids). According to CS4, the cycle was a 12-week cycle that would start with a high dose at the beginning of the cycle and then the dose would progressively get lower throughout the cycle. CS4 stated that Lance Tomlinson wanted $500.00 U.S. currency per vial. CS4 did not start this cycle, because CS4 felt that the cycle was too expensive.

48. CS4 stated that at the time CS4 was talking to Lance Tomlinson about the

14

"Star Cycle," Lance Tomlinson showed CS4 a vial of "Deca" which had been concealed at the store. CS4 stated that CS4 looked briefly at the vial. CS4 noted that the label to the vial was in English, and not Spanish. CS4 stated that after Lance Tomlinson told CS4 about the star cycle, CS4 did not ask Lance Tomlinson about steroids again until approximately February 2007. At that time, CS4 stated that CS4 approached Lance Tomlinson and asked about a six-week cycle of Winstrol (another anabolic steroid). CS4 stated that Lance Tomlinson said the cycle would cost $700.00. CS4 stated that CS4 felt that the price was too much, and as a consequence, CS4 did not purchase the cycle from Lance Tomlinson. CS4 stated that Lance Tomlinson would always describe his products as "pharmaceutical grade."

### RECORDED TELEPHONE CONVERSATION WITH BRANDON TOMLINSON

49. On April 27, 2007, CS3, on behalf of CS2, provided law enforcement with a previously recorded conversation between an individual named "Brandon," believed to be Brandon Tomlinson, and CS2. The recording, which was made without the involvement of law enforcement in approximately, contains only one audible voice belonging to an individual identifying himself only as Brandon, apparently because CS2 recorded the phone call on his cellular phone through a feature on CS2's cell phone. The recording was made in approximately early 2007. I have discussed this recording with CS2, and CS2 has authenticated the recording and confirmed that the recording is of a conversation between CS2 and Brandon Tomlinson.

50. The following paragraphs contains a synopsis of pertinent portions of the recording. The recording begins with Brandon Tomlinson inquiring if CS2 received the "dosing instructions" from Lance (believed to be referring from Lance Tomlinson) and suggesting that CS2 go to Genentech's website, Genentech.com. Brandon Tomlinson then directs CS-2 to the Immunology section of the website discussing Raptiva.

15

51. Brandon Tomlinson referred to the directions provided by Lance Tomlinson to CS2, and discusses the dosing of Raptiva, stating that the proper dosage is one milligram of Raptiva for every kilogram of body weight. Brandon Tomlinson suggested that CS2 find a website to assist in the conversion of pounds to kilograms to ensure accuracy.

52. Brandon Tomlinson also described the Raptiva given to CS2, stating that the smaller bottles are considered the "Gold Standard" and have very high concentrations of Raptiva. The larger bottles contain lower concentrations of Raptiva. Brandon Tomlinson suggested that CS2 take all the small bottles in one dosage to acclimate CS2's body to Raptiva. Brandon's rationale for this is that exposure to Raptiva in its purest form will help alleviate any future side effects.   The quantity provided by Brandon Tomlinson to CS2 is approximately eight weeks, but Brandon Tomlinson again directed CS2 to take the first dose to ensure that CS2 experiences no harmful side effects before taking the low concentration Raptiva.

53. Brandon Tomlinson also stated that a bottle labeled "Protropin" was intended for Lance Tomlinson rather than CS2. Brandon Tomlinson then explained that Protropin (a specific kind of HGH) is one amino acid larger than Nutropin (a second variety of HGH). Brandon Tomlinson then stated that the Protropin is in powder form and equal to a 5 mg dose. Brandon Tomlinson further inquired as to whether CS2 was familiar with "green caps," referring to Nutropin, which are 10mgs per dose. Brandon Tomlinson told CS2 that CS2 was welcome to the Protropin and should use pure water when reconstituting the Protropin for injection. Brandon Tomlinson further stated that the "stuff is the real deal," referring to the Protropin and directed CS2 to scrape the label off the Protropin bottle "so there is no traceability." Brandon Tomlinson continues stating that the Protropin, like the Raptiva, are from the gold standard stocks. Brandon

16

also stated that when he was taking the Raptiva, he saw the Protropin and took it as well including it with the Raptiva.

54. Brandon Tomlinson again warned CS2 of the possibility of severe side effects when taking Raptiva, and suggested that CS2 not take any Nutropin with Raptiva. Brandon Tomlinson also expressed apprehension about giving the Raptiva to CS-2, stating, "there are no bad reactions" with HGH, but with antibody technology such as Raptiva a person's immune system could react badly. This according to Brandon is why he has never given Raptiva to Lance for sale before this occasion, stating "there is not enough money in it."

55. Brandon Tomlinson also emphasized to CS2 not to disclose where CS2 obtained the Raptiva from. Brandon Tomlinson stated words to the effect that people became honest in the hospital when asked "what they took" and "where they obtained it," in an apparent reference to the possibility that CS2's use of the drugs could cause negative side effects. Brandon Tomlinson then directed CS2 to tell people CS2 obtained the Raptiva from the Internet. Brandon also discussed the consequences if it were disclosed that he (Brandon Tomlinson) provided CS2 with the Raptiva, stating it would destroy his career. Brandon Tomlinson told CS2 that he only obtained the Raptiva for CS2 as a favor for Lance Tomlinson.

56. Before ending the conversation, Brandon Tomlinson asked CS2 to keep him informed of CS2's use of the Raptiva. Brandon Tomlinson also stated that he had obtained Raptiva twice before for two separate people who had two different results. The first had an extremely positive reaction with the Raptiva, while the second experienced some problems with the drug.

### 7/3/07 UNDERCOVER PURCHASE OF HGH FROM THE MERIDIAN MAX MUSCLE STORE

57. On July 3, 2007, CS2 and a DEA agent acting an undercover capacity, and

posing as an associate of CS2 (hereafter referred to as the UC), entered the Max Muscle store located at 1525 Meridian in San Jose. CS2 had previously arranged with Lance Tomlinson to pick up and pay for 20 bottles of HGH.

58. CS2 and the UC approached the check-out counter and spoke to "Jeff" (later identified as Jeffery William Coffron), a store employee. Coffron advised CS2 that "Lance" (referring to Lance Tomlinson) was not working and was at home. CS2 introduced the UC to Coffron. CS2 informed Coffron that the UC just moved from Los Angeles and that the UC was going through a divorce. CS2 and Coffron engaged in a general conversation about the Max Muscle store. CS2 then told Coffron that CS2 needed to pick up 20 bottles (referring to twenty bottles of HGH that CS2 had previously arranged to pick-up at the store pursuant to a conversation with Lance Tomlinson). Coffron advised CS2 that he did not know anything about "it" (referring to CS2 picking up twenty bottles of HGH) and would need to call and talk to "Lance" (referring to Lance Tomlinson) about picking the "stuff" up.

59. CS2 then called Lance Tomlinson's cell phone, 408-806-4755, regarding the acquisition of the 20 bottles of HGH from the Max Muscle store. CS2 reached Lance Tomlinson and stated that he was at the store to pick up the 20 bottles (referring to twenty bottles of Human Growth Hormone.) CS2 told Lance Tomlinson that CS2 would be paying cash for the "bottles" and would not be using a credit card. Lance Tomlinson told CS2 that is was "ok" and then asked CS2 to put "Jeff" on the phone. CS2 then handed the phone to Coffron, who walked just outside of the Max Muscle store with CS2's cellular phone to speak with Lance Tomlinson, apparently to conceal the conversation from CS2 and the UC. After Coffron was finished talking to Lance Tomlinson, he walked back into the Max Muscle store. Coffron told CS-2 that he would get the 20 bottles (referring to the HGH) for CS2. Coffron then went to a commercial-sized glass door

refrigerator that contained several different types of sports drinks located near the front door of the

Max Muscle store. The UC observed Coffron remove several bottles of sports drinks from the

bottom shelf of the cooler. The UC then observed Coffron retrieve a bag that appeared to be

concealed in the cooler behind several sports drinks and then walk to a back room of the store,

where the UC could no longer observe Coffron. CS2 walked towards Coffron and told Coffron that

CS2 wanted two extra bottles for a total of 22 bottles (referring to the HGH). Approximately five

minutes later, Coffron returned from the rear of the store and walked to the check out counter.

60. CS2 informed Coffron that Lance Tomlinson had previously agreed to sell the

bottles to CS2 for ninety dollars a bottle. The UC asked Coffron if the bottles were good quality.

Coffron advised the UC in a nervous manner that he "does not know anything about anything."

The UC then asked Coffron how much the bottles normally sell for. Coffron advised the UC that

he did not know. Coffron asked ~~CS-2~~ if CS2 was paying with a credit card. CS2 informed Coffron

that the UC would be paying cash for the bottles. The UC asked how much the 22 bottles would

cost. Coffron advised the total price for the bottles would be one thousand nine hundred eighty

($1980.00). The UC then counted out $2,000 and handed the money over to Coffron. Coffron then

gave the UC a plastic bag labeled Max Muscle store that contained a plastic cup that further

contained 22 clear bottles of HGH. The UC and CS2 then departed the Max Muscle store.

## PHONE CALL TO CS-2 FROM LANCE TOMLINSON AFTER THE PURCHASE OF HGH

61. On July 3, 2007, immediately after departing the Max Muscle store, CS2

received multiple incoming calls from telephone number 408-806-4755, the cellular telephone of

Lance Tomlinson. CS2 did not answer the calls from Lance Tomlinson at this time. At

approximately 1:37 p.m., CS2 placed a DEA-monitored and recorded call to 408-806-4755 Lance

Tomlinson's cellular telephone.  Lance Tomlinson wanted to know why the CS2 brought someone

to the store with CS2 (referring to the UC).  Lance Tomlinson stated that if he (Lance Tomlinson)

had been there he would never have done it (referring to completing the sale of the 22 bottles of

HGH in the presence of the UC).  Lance Tomlinson advised CS2 that CS2 did not understand the

ramifications of bringing someone new to the store.  CS2 explained to Lance Tomlinson that the

UC was "cool" and the UC was doing the same "stuff" down in Los Angeles.  CS2 further

explained that CS2 would never bring anyone to the store that would jeopardize anything.  Lance

Tomlinson wanted to know why the UC paid for the product.  CS2 advised Lance Tomlinson that

the product was ultimately for the UC.

### TEST RESULTS OF HUMAN GROWTH HORMONE PURCHASED FROM
### THE MAX MUSCLE STORE

62.  On July 26, 2007, and July 31, 2007, SA Michael Baxter of the Food & Drug

Administration (hereinafter FDA) received results from FDA Forensic Chemistry Center regarding

the items obtained from CS3 and the items obtained by the UC during the 7/3/07 purchase at the

Max Muscle Store.   The "Protropin" bottle tested positive for a specific type of HGH which was

only legally manufactured in the United States by Genentech

63.  The results of the FDA analysis for the 22 bottles purchased from the Max

Muscle Store on 7/3/07 were positive, indicating the presence of HGH.  The amount of HGH was

determined to be 12 mg per vial, for each vial.

### SUBPOENA RESPONSE FROM AT&T FOR LANCE TOMLINSON'S CELL PHONE

64.  In furtherance of this investigation, I have requested and received telephone

20

records for the cell phone of 408-806-4755, the cell phone number which I believe to be used by Lance Tomlinson.  The records demonstrate that this cellular phone is subscribed to by Lance Tomlinson at 1525 Meridian Rd., San Jose CA.

### WESTERN UNION INFORMATION FOR LANCE TOMLINSON

65.  I have further obtained information from Western Union regarding Lance Tomlinson's use of wire transfers to obtain items from China, a location which I know, from my training and experience, to be a source country for anabolic steroids and items associated with anabolic steroids.  The wire transfer records demonstrate that Lance Tomlinson wire-transferred $1,850.00 on May 16, 2006 to one  Lipang Wang in Changchun, China.

21

## CONCLUSION

66.  Based upon the above-summarized facts, including the July 3, 2007 distribution

of 20 bottles of HGH to the UC by Coffron at Lance Tomlinson's direction at the Muscle Max

Store in San Jose, the recorded statements of Brandon Tomlinson regarding his obtaining of drugs

on behalf of Brandon Tomlinson, and the drugs obtained by CS2 from Lance Tomlinson's

residence related to Genentech, I believe there is probable cause that Lance Tomlinson,

Brandon Tomlinson, and Jeffrey Coffron knowingly conspired to possess with intent to distribute,

and to distribute, HGH in violation of 18 U.S.C. § 371.

Patrick Donlin
Special Agent, DEA

Subscribed and sworn to me this _19_ day of September

PATRICIA V. TRUMBULL
UNITED STATES MAGISTRATE JUDGE

22